# EDWARD W. EMERY v. FIRST NATIONAL BANK OF BOWBELLS and A. C. Wiper.

### (156 N. W. 105.)

**Conveyance — action to set aside — suit in equity — jury — Newman act — statutes — appeal — supreme court — review — errors.**

1. Where, in a suit in equity to set aside a conveyance of land, a jury is requested and certain issues are submitted to it for determination, the provisions of § 7846 of the Compiled Laws of 1913, being the so-called Newman act, do not apply, and upon appeal the supreme court will not try the case anew, but will sit as a court of review for the correction of errors merely.

**Conveyance — suit in equity — to set aside — undue influence — jury — ratification — trial court — dismissal of jury — findings — conclusions.**

2. Where, in a suit in equity to set aside a conveyance of land, a jury is

requested for the trial of certain issues, and there is merely submitted to such jury the question whether undue influence was exerted upon the plaintiff to induce him to execute the deed in controversy and at the time of its execution, but it transpires upon the trial, and the proof is positive and uncontradicted that subsequently to the time of such execution the plaintiff fully ratified the same and under circumstances where no duress or undue influence could exist, it is not error for the trial judge to dismiss the jury without listening to its verdict on the issue submitted to it, and to make findings of fact and conclusions of law, and to himself determine the case on the issue of ratification, which was reserved to himself, and not so submitted.

**Discretion of court — trial judge — pleadings — amendment of — mental incompetency — other and different issues.**

3. It is not an abuse of discretion for a trial judge to refuse to allow an amendment to the pleadings setting up a claim of mental incompetency after the plaintiff has closed his case and such plaintiff has allowed the case to be tried for a number of days upon other and different issues.

Opinion filed February 4, 1916.

Appeal from the District Court of Ward County, *F. E. Fisk,* Special Judge.

Action to set aside a deed to real estate and a bill of sale of personal property. Judgment for defendant. Plaintiff appeals.

Affirmed.

Statement of facts by BRUCE, J.

This is an action to set aside a deed to real estate and a bill of sale of personal property executed by the plaintiff to the defendant, A. C. Wiper, the cashier of the defendant bank, the First National Bank of Bowbells. The reason given in the complaint is that "the plaintiff herein is not strong physically, and, under the severe strain necessarily imposed by the demands of the defendants and their threats to settle their claims, he was not mentally responsible for his actions; that said defendants took advantage of their confidential relations with him, and his distress and physical and mental condition, and induced this plaintiff to execute conveyances of all of his property to them." It is also alleged in the complaint "that the reasonable value of plaintiff's real estate heretofore described, and consisting of 380 acres of land is, at the present time, $25 per acre without improvements; that

the improvements on said land, consisting of a seven-room, two-story house, two large barns, and fencing around all of the divisions of such farm, are worth $3,500 to $5,000." This would make a total of $14,-500, or about $31 an acre. The testimony varies from $20 to $50 an acre. According to the testimony, as we view it, the plaintiff on the 14th day of December, 1911, was the owner of 380 acres of farm lands located within a mile of the center of the business part of the town of Bowbells, in Burke county, North Dakota. He was also the owner of some 13 or 18 head of horses and colts and of a considerable amount of farm machinery and appliances. Upon the farm there existed a first mortgage for $5,000. At that time he was also indebted to the First National Bank of Bowbells in the sum of $2,700, for which sum the bank held a mortgage upon his personal property. He also appears to have been owing some $3,000 for back taxes and to his general creditors. He was a single man, having secured a divorce from his wife some years before, and had living with him on the farm two young children. He was forty-eight years of age. He had come from Canada in 1906, and had brought with him several thousand dollars which he had invested in the farm and in his farming operations at Bowbells. A few days prior to December 14, 1911, and before the execution of the deed and bill of sale in question, the defendant bank seized the personal property of the plaintiff under its chattel mortgages, and, at the time of the execution of such deed and bill of sale, notices of foreclosure were in the hands of the printer for publication. It appears, however, that before such seizure and before the execution of the said instruments, the said Emery had consulted a member of the firm now representing the plaintiff, and that such lawyer had gone with him to the bank to see the defendant Wiper, and had asked for a statement of the accounts between the parties, which the said Wiper agreed to furnish him the next day; that before furnishing such statement, however, Mr. Wiper sent for the plaintiff, and after à meeting at the bank, which occupied some hours and which was held in the night of December the 14th, the plaintiff executed the deed and bill of sale in question, and later fully ratified the same. The evidence of this ratification will be found in the opinion. Later the plaintiff brought the present action to set aside the conveyances. The consideration for the said deeds and bill of sale appears to have been a certificate of deposit for $900, which was tendered in court

and offered to be returned on the trial, three cows at the agreed price of $100; an oral agreement to pay the outstanding debts and past-due taxes of the plaintiff, amounting to about $3,000; the assumption of the $5,000 mortgage upon the farm, and the extinguishment of the claims of the bank which were secured by chattel mortgages and which amounted to about $2,700. This amounted in all to about $11,900, or, exclusive of the chattel mortgage debts, to $9,200. It is proved that 1910 and 1911 were dry years and that poor crops were raised.

On November 16, 1912, and about sixty days before the trial began, the presiding judge of the district court of Ward county, at the request of the plaintiff, made an order that seven certain questions and "such other questions as might be deemed proper" should be submitted to a jury and answered upon the trial. These original seven questions were as follows:

First: Was the plaintiff induced by the defendants, or either of them, to execute and deliver the deed and bills of sale referred to in ¶ 6 of the complaint, by the deceit or misrepresentation of facts by the defendants, or either of them, and on which the plaintiff relied?

Second: If your answer to the foregoing question is "Yes," then state whether such deceit was practised or misrepresentation was made by one or both of said defendants, and, if only one, specify which.

Third: If your answer to the first question is "Yes," then was such deceit practised, or were such misrepresentations made, with the intent to cheat or defraud the plaintiff?

Fourth: Did the defendants, or either of them, make use of their confidential relations with the plaintiff, or take oppressive or unfair advantage of the plaintiff's necessities or distress to induce him to execute and deliver such deed and bill of sale?

Fifth: If your answer is "Yes," to the last question above, then state whether such conduct was that of both the defendants or of only one, and, if by one only, state which.

Sixth: Was the plaintiff induced to execute and deliver such deed and bill of sale by threats of the defendants, or either of them, of injury to the person or property of the plaintiff?

Seventh: If "Yes," is your answer to the last question, state whether such threats were made by both said defendants, or only by one, and, if by one only, state which.

Later and on the trial, the Honorable Frank E. Fisk, who had been called in to try the case in the place of the presiding judge of the district, refused a request of the plaintiff to submit certain additional questions to the jury, and which questions related entirely and exclusively to the value of the land and of the personal property which was seized under the chattel mortgage.

In refusing to submit these questions, the court said: "I think under that order we have a right, as far as that is concerned, to submit additional questions, but I do not believe that these questions are proper as to value. Of course, the jury, in determining the question of fraud, will have a right to consider in their own minds whether it was an equitable deal between the parties, but I do not believe it is proper to have them bring in a verdict finding the value; because that is a matter for the court, and an accounting of the court determines that. As far as their taking that into consideration, the question of fraud, they will do that anyway, and I will deny the motion." To this ruling the plaintiff excepted. Counsel for plaintiff later, and at the close of his case, asks to have the following interrogatory submitted:

"Nine: At the time of the making, execution, and delivery of the deed and bill of sale whereby the plaintiff conveyed to the defendant Wiper the real and personal property described in the complaint, was his mental capacity such as to make him incompetent to transact the business involving the execution and delivery of such conveyances?"

This offer was objected to "on the grounds set forth in prior objections, and on the further ground that the same was not admissible under the pleadings as shown and set forth in ¶ 8 of plaintiff's complaint, reading as follows: "That the plaintiff herein is not strong physically, and, under the severe strain of necessity imposed by the demands of the defendants, and their threats to settle their claims, he was not mentally responsible for his actions; that said defendants took advantage of their confidential relations with him, and his distress and physical and mental condition, to induce this plaintiff to execute conveyances of all of his property to them." The motion of the plaintiff for the submission of the questions was then overruled and an exception taken. A motion was then made by the defendant for a dismissal of the action on the ground "and for the reason that plaintiff has failed to substantiate the allegations of the complaint by proof which is clear and con-

vincing, and which is sufficient to leave in the mind of the court no hesitancy in setting the same aside and declaring them null and void, and failed in every particular to prove such allegations." This motion was in turn overruled. All of these latter motions were made at the close of the plaintiff's case.

Shortly thereafter, and after the examination of one of the witnesses for the defendant, the plaintiff asked leave to amend the complaint so that the first line of ¶ 8 would read as follows: "At the time of the transaction herein referred to, the plaintiff was not strong physically or mentally," and which amendment would have made the paragraph as a whole read: "That at the time of the transactions herein referred to plaintiff was not strong physically or mentally, and, under the severe strain of necessity imposed by the demands of the defendants, and their threats to settle their claims, he was not mentally responsible for his actions; that said defendants took advantage of their confidential relations with him, and his distress and physical and mental condition, to induce this plaintiff to execute conveyances of all of his property to them." This amendment was objected to on the ground that "the amendment entirely changes the issues in this case, and raises new issues which the defendants are not ready to meet, the same comes as a surprise at this time to the defendants, the trial of this action having commenced in this court on the 7th day of January of this month, having been consumed in the taking of testimony on the original pleadings, and the defendants having been prepared to meet the allegations as contained in the original pleadings, and are not at this time ready to meet the allegations as they would stand in the amendment, and could not be prepared to meet the same for some little time, and in the event said amendment is allowed, the defendants would ask that the jury be dismissed and discharged, and a continuance granted said defendants, and the case set for hearing at some future date, and the costs of the present trial taxed to the plaintiff." The motion was then denied and the amendment disallowed. At the close of the trial plaintiff again asked to amend the complaint, the amendment asked being substantially the same as before, but being in the words: "That at the time of and during the negotiations leading up to the execution of the deeds and bill of sale referred to, the plaintiff herein was not strong physically or mentally, and that, under the severe strain of necessity imposed by the demands

of the defendant and their threats to enforce their claim, he was not mentally responsible for his actions; that such defendants took advantage of their confidential relations with him, and his distress and physical and mental condition, to induce this plaintiff to execute the conveyances of all of his property to them." This motion was denied. The defendant then moved that the jury be discharged, and that the court dismiss the action and enter judgment in favor of the defendant upon the ground and for the reason "that the plaintiff has failed to substantiate any and all of the allegations of his complaint, and that there is at this time no testimony or proof before the court of a sufficient nature to base a judgment upon in favor of the plaintiff and sustain any allegations of the complaint, or instruct the jury to answer any and all interrogatories submitted to them in this case in favor of the defendant in this action, and that said action be dismissed." The court then said: "I will grant the motion, and the jury will be dismissed, and the case will be dismissed." Counsel for plaintiff then excepted to this ruling.

Thereupon the trial judge made his findings of fact and conclusions of law, the findings of fact being to the effect that the value of the real estate was $13,000; that the indebtedness to the defendant bank was $10,500; *that immediately subsequent to December 14, 1911,* the plaintiff ratified the agreement; that no confidential relations existed between the parties; that at the time of entering into the agreement the plaintiff was not weak mentally, but knew and understood the nature of his every act in connection therewith, and entered into the transaction of his own free will, and that his acts in entering into the same were not caused or brought about by fraud or duress or threats. A judgment was accordingly entered dismissing the action and confirming the title of A. C. Wiper in the real estate and the personal property. From this judgment the present appeal has been taken, and errors have been specified.

*Palda, Aaker, & Greene,* for appellant.

In an equity action, where a jury is called in to try certain specified issues of fact, the general rule is that the verdict is merely advisory. But it would seem that the rule would be different here, where the procedure is to receive all the evidence offered, and where a trial *de novo*

may be had in the supreme court. Reed v. Cline, 9 Gratt. 136; Baker v. Williamson, 2 Pa. St. 116; Adams, Eq. 376, note 1; McDaniel v. Marygold, 2 Iowa, 500, 65 Am. Dec. 786; Learned v. Tillotson, 97 N. Y. 1, 49 Am. Rep. 508.

The verdict of the jury in such a case may be used, followed, or abandoned, in the judicial discretion of the court. Miller v. Wills, 95 Va. 337, 28 S. E. 337; Peckham v. Armstrong, 20 R. I. 539, 40 Atl. 419; 16 Cyc. 423–426; Beach, Eq. Jur. 125.

"Any relation may be deemed confidential arising from nature or granted by law, or resulting from contract, where one party is so situated as to exercise a controlling influence over the conduct and interests of another, or where the law requires the utmost good faith." People ex rel. Crunney v. Palmer, 152 N. Y. 217, 46 N. E. 328; Robins v. Hope, 57 Cal. 493; Brown v. Mercantile Trust & D. Co. 87 Md. 377, 40 Atl. 256.

*D. C. Greenleaf, Bradford & Nash,* and *Francis J. Murphy,* for respondents.

Duress, menace, and undue influence must be shown by evidence of the clearest and most satisfactory character, before the deed will be set aside. Jasper v. Hazen, 4 N. D. 1, 23 L.R.A. 58, 58 N. W. 454.

It must clearly appear that the deed would not have been given excepting for the threats and undue influence. McGuin v. Lee, 10 N. D. 160, 86 N. W. 714.

In suits in equity the verdict of a jury is merely advisory on the question submitted, and therefore is subject to the control of the court. Prondzinski v. Garbutt, 8 N. D. 191, 77 N. W. 1012.

The plaintiff's original complaint is a direct charge that defendants brought about the mental condition of the plaintiff, and defendants prepared their defense along those lines. His general mental condition was not in issue, and no preparation was made to meet such issue, and no amendment covering same was sought or asked until after nine days' continuous trial. The motion to so amend was properly denied. Wood v. Pehrsson, 21 N. D. 357, 130 N. W. 1010.

BRUCE, J. (after stating the facts as above). According to the brief of appellant, his discussion is limited to the following points:

1. Had the trial court the right upon the record in this case to dis-

charge the jury and make the findings of fact and the order dismissing the action?

2. The insufficiency of the evidence to sustain the three vital findings of fact; namely, the second, fourth, and fifth.

3. The error of the court in refusing the plaintiff's application to amend his complaint.

The first question that presents itself is whether an equitable action to set aside a deed, and in which a jury is summoned, comes within the provisions of the Newman act so that a trial *de novo* can be had in this court.

In passing upon this question this court in the case of Peckham v. Van Bergen, 8 N. D. 595–597, 80 N. W. 759, said: "The question is this, whether § 5630 of the Revised Codes, § 6193, Comp. Laws 1913 [being the Newman act] as amended by chapter 5 of the Laws of 1897 governs the procedure in the district court and in this court in an equity case wherein the trial court calls a jury to its aid for advisory purposes. It is our opinion that said statutes do not govern in such cases. That the district court may, at its discretion, call in a jury for an advisory verdict in an equity case is entirely clear. This is the old and well-established practice in courts of equity, and this practice is clearly recognized in the Code of Civil Procedure, Revised Codes, § 5420. But when this course is adopted in the trial of equity cases, the practice which regulates such trials—the same not being governed by statutory provisions—must be sought for in elementary treatises, and in the decisions of the courts. In the absence of controlling statutory provisions, the ordinary rules of evidence would be applicable in such cases, and would govern in the elicitation of the evidence; and upon appeal this court would not try the case anew, but would sit as a court of review for the correction of errors, as was the practice here in all cases prior to the enactment of the statute found in chapter 83 of the Laws of 1893, popularly known as the 'Newman Law.'" This case seems to be conclusive upon the matter before us, and to limit our investigation to errors of law and to errors of law alone.

The next point is whether a jury having been summoned and questions submitted to it, it was within the power of the court to discharge that jury and to withdraw the questions from it, and this point is presented in two ways by counsel for appellant. He first contends that

the verdict of the jury upon the questions of fact submitted would, if rendered, have been as conclusive upon the court as a finding of fact of a jury in a common-law action, and that it was therefore error not to wait for and to listen to them. He then states that, even if this is not so and the jury in such cases merely acts in an advisory capacity, the court cannot pass upon the questions of fact himself without having first listened to and had the advice of the jury, and that the advice of the jury is, as it were, in the nature of expert evidence in the case.

These propositions seem also to have been considered in the case of Peckham v. Van Bergen, supra. On page 599 the court says: "Nor does the fact that a jury in this case was called in an advisory capacity militate against the construction we have given this statute. The terms of the statute confine its operation to all cases tried in the district court 'without a jury.' It is true that the verdict of a jury is not binding upon the court in equity cases. The trial court is vested with a discretion to vacate such verdict in whole or in part, but *this does not alter the fact that such verdicts are entitled to receive grave consideration at the hands of trial courts.* Juries are not called, even in equity cases, as a mere formality; and their findings are seldom disregarded by courts of chancery, *unless the same are clearly wrong.* Experience has shown that, for the trial of many questions of fact, an average jury is the best of all tribunals. It is for this reason that courts of equity have always been clothed with a discretion to call a jury to their aid in determining mere questions of fact; and, in our judgment, it is quite as important in an equity case as in a law case to exclude from the consideration of juries composed of laymen all evidence which is inadmissible under the established rules of evidence."

This case seems to establish two propositions: One, that the verdict of the jury is merely advisory, and the other, that the verdict of the jury should be listened to and given its weight. We do not infer that this court meant to state that such verdicts should always be controlling. In fact, nowhere in the authorities do we find any such rule except in cases which were handed down under the ancient practice. The most extreme limit of the rule that we can find being that if, after the receipt of the verdict, the chancellor was still in doubt, or his mind still oscillated *as to the question so* submitted, his doubt should be resolved in favor of the verdict. See McDaniel v. Marygold, 2 Iowa, 500, 65 Am. Dec. 786.

The cases, indeed, are innumerable which hold that in an equity case, and even where questions of fact are submitted to the jury, the mind to be convinced is, after all, the mind, not of the jury, but of the chancellor, and that the suits none the less partake of the nature of suits in equity. Re Hudson, — Minn. —, 155 N. W. 393; Bethany Hospital Co. v. Philippi, 82 Kan. 64, 30 L.R.A.(N.S.) 194, 107 Pac. 530; 38 Cyc. 1936; Watson v. Borah, 37 Okla. 357, 132 Pac. 347; Re Peck, 87 Vt. 194, 88 Atl. 568; Avery Mfg. Co. v. Crumb, 14 N. D. 57, 63, 103 N. W. 410.

Although, too, there is a conflict of authority as to whether, after issues have once been submitted to a jury, that submission may be withdrawn and the cause thereafter be tried by the court alone; that is to say, whether the court may withdraw these issues and questions, and pass upon the questions submitted, without first listening to and having his conscience made acquainted with that verdict; and this court has held that where a verdict is actually received it should be duly considered, and that, after it has been received, the court has no power to order further evidence, or to have his conscience affected by evidence which was not presented to the jury upon the questions submitted to them. Peckham v. Van Bergen, 8 N. D. 595, 80 N. W. 759. There can be no dispute that in a suit in equity to cancel or set aside a deed, the conscience or the mind that is ultimately to be affected and to which the proof must appear clear and convincing is the mind of the chancellor. It follows, therefore, that if, during the course of the trial, it becomes evident to the chancellor that the questions submitted are outside of the real issues of the case or are not controlling, he may withdraw the submission of the same, and can decide the case on the issues, retained exclusively by him and which are controlling. He, under the established principles of equity practice and under the provisions of our Code, has the ultimate power to set aside or modify the verdict, when once received, even though he should carefully consider it. He must, therefore, have the power to refuse to consider it at all when its determination would have no effect, one way or another, on the final issues in the case. Kohn v. McNulta, 147 U. S. 238, 37 L. ed. 150, 13 Sup. Ct. Rep. 298; Perege v. Dodge, 163 U. S. 160, 41 L. ed. 113, 16 Sup. Ct. Rep. 971, 18 Mor. Min. Rep. 364; 7 Enc. U. S. Sup. Ct. Rep. 756.

Section 7608 of the Compiled Laws of 1913 provides that "an issue of fact in an action for the recovery of money only, or of specific real or personal property, must be tried by a jury, unless a jury trial is waived as provided in § 7637, or a reference is ordered as provided in §§ 7645 and 7646. Every other issue is triable by the court, which, however, may order the whole issue or any specific question of fact involved therein to be tried by a jury or by a referee as provided in §§ 7645 and 7646." Section 7645 provides: "All or any of the issues in an action whether of fact or law or both may be referred by the court or judge thereof upon the written consent of the parties," etc., and this section relates merely to references and to referees. Section 7646 provides: "When the parties do not consent to the reference the court may upon the application of either party or of its own motion direct a reference in the following cases: [1 and 2, generally in cases where an accounting is necessary]. 3. When a question of fact other than upon the pleadings shall arise upon motion or otherwise in any stage of the action."

One cannot read § 7608 in conjunction with §§ 7645 and 7646, to which it refers, without being firmly convinced that a reference, whether to a jury or to a referee, is, in North Dakota, a matter which is entirely within the discretion of the trial judge. It is worthy of notice, indeed, that in § 7608 the statute expressly states that an issue of fact in an action for the recovery of money only, or of specific real or personal property, *must* be tried by a jury unless a jury trial is waived, but when it comes to other issues it expressly provides that "every other issue is triable by the court, which, however, may order the whole issue, or any specific question of fact involved therein, to be tried by a jury or by a referee, as provided in §§ 7645 and 7646." The words "must" and "may" are antithesized. They must be held to have been advisedly used, and it is perfectly clear to us that the statute in equitable actions merely intended to re-enact the well-established law which allowed the chancellor in such a case, if he saw fit, but only if he saw fit, and in the exercise of his sound discretion, to submit any or all of the issues to a jury for an advisory verdict thereon. In the states where the procedure is unaffected by statute and is such as prevails under the ancient law, there has never been any pretense that a reference to a jury of an issue in an equitable case was a matter of constitu-

tional right. Thomas v. Ryan, 24 S. D. 71, 123 N. W. 68; De Graff v. Manz, 251 Ill. 531, 96 N. E. 516; 38 Cyc. 1936, and cases cited; Hogan v. Leeper, 37 Okla. 655, 47 L.R.A.(N.S.) 475, 133 Pac. 190; Bethany Hospital Co. v. Philippi, 82 Kan. 64, 30 L.R.A.(N.S.) 194, 107 Pac. 530.

There is nothing in our Constitution which leads us to any such inference, and the statute (Comp. Laws 1913, § 7608) clearly leaves the matter within the discretion of the trial judge.

It is perfectly true that we have held that where an issue is once referred to a jury, the verdict of the jury is entitled to receive grave consideration at the hands of the trial court. Peckham v. Van Bergen, 8 N. D. 595, 80 N. W. 759. We have never held, however, that where, during the course of a trial, it becomes apparent that an issue of fact which has not been submitted to the jury and a request for the submission of which has not even been made, in controlling in the case, the mere fact that other facts or issues have been submitted, takes away from the chancellor his inherent powers, and that he cannot decide the case on this issue without waiting for and considering the verdict of the jury and when that verdict would not have affected that issue, no matter in whose favor it had been rendered. Sanders v. Simcich, 65 Cal. 50, 2 Pac. 741.

Such is the state of the issues and of the record in the case at bar. The questions which were submitted to the jury relate purely to the execution of the deed and bill of sale *on the 14th day of December, 1911,* and are illustrated by the first question, which reads: "Was the plaintiff induced by the defendants or either of them to execute and deliver the deed and bill of sale referred to in ¶ 6 of the complaint, by the deceit or misrepresentation of facts by the defendants or either of them, and on which the plaintiff relied?" and the fourth, which reads: "Did the defendants or either of them make use of their confidential relations with the plaintiff or take oppressive or unfair advantage of the plaintiff's necessities or distress to induce him to execute and deliver such deed and bill of sale?" and the sixth, which reads: "Was the plaintiff induced to execute and deliver such deed and bill of sale by threats of the defendants or either of them, of injury to the person or property of the plaintiff?" Even the additional question subsequently requested, the submission of which was refused as it did not appear

to the court to be covered by the pleadings, was to the same effect, and covered the same point and the same transaction. It was: "9. *At the time of the making and execution and delivery of the deed and bill of sale* whereby the plaintiff conveyed to the defendant Wiper the real and personal property described in the complaint, was his mental capacity such as to make him incompetent to transact the business involving the execution and delivery of such instruments?"

If this later question proposed to amend the pleadings, and was intended to raise the new contention that the plaintiff was insane or generally feeble-minded so as to be generally incapable of executing contracts, there was, of course, no error committed in refusing its submission, as well as the requested amendment to the pleadings on which it was sought to be based. The amendment to the pleadings was not asked until after the trial had proceeded for several days, and after the conclusion of the plaintiff's case, and it can hardly be said that it was an abuse of discretion to refuse to allow such an amendment at such a time.

The plaintiff, however, does not pretend any such thing, and the record before us negatives any such intention. We have no evidence of the appointment of a guardian or conservator, and the suit at bar is not even brought by a guardian *ad litem* or by a next friend. It is brought by the plaintiff himself, and by attorneys employed by him, and the deed is sought to be set aside almost entirely upon his own testimony. If he is mentally incompetent to make any contract, it is difficult to see how he could make any valid contract of employment even with his attorney. The case, indeed, is brought on the theory and on the theory alone (and we are now quoting from the language of counsel himself, in his brief on the rehearing), "that is to say, on the theory that the plaintiff, *though not insane or generally contractually incompetent,* was a weak man and liable to be easily influenced, and that the defendant Wiper *on the 14th day of December, 1911,* overpowered his will be inducing him to sign a deed and bill of sale in the absence of his counsel, when he was harassed by the fact that the bank has seized his personal property under its chattel mortgage and was threatening to foreclose and sell the same, and by fraudulent concealment of his actual indebtedness and the actual state of his account." "The proof shows," says counsel in his petition for a rehearing, "that the plaintiff was weak-

minded and easily influenced, and was in dire distress; he was persuaded that his financial condition was hopeless. He says Wiper told him that if he did not give him the deed and bill of sale he (Wiper) would follow him. He was possessed of a farm, but without means of tilling it, and he faced the necessity of supporting his family of little children. The jury saw the two men, and under all of these circumstance can this court say, from the cold record before us, that there was no overmastering influence on one side and mental weakness, necessity, and distress on the other? Can it so determine that such weakness, supplemented by the necessity and distress, was not the cause of plaintiff's yielding to the overmastering influence of the successful banker, who seems to have had his hand on everything and was disposed to yield nothing."

We very much doubt if these facts are as conclusively proved as counsel maintains, but rather the folly of a weak, but not insane, man who, for fear of incurring a lawyer's bill, chooses to go ahead with a business transaction without sufficient legal advice. Even if all that counsel maintains, however, is true, and was supported by the proof, that fact would have no effect on the real and controlling issue in the case and which is ratification.

Counsel for plaintiff and appellant do not pretend that there is any proof of actual fraud, or that there is any proof of any false statements, and he ignores entirely, in his petition for a rehearing and in his brief on such rehearing, the plaintiff's subsequent ratification of the deed and bill of sale, and which was evidenced by the giving of orders to his creditors on the money which he was to get out of the transaction, and the taking of certain cows which were to be given to him under the agreement, in place of a hundred dollars of the purchase price, and accepting as a gift machinery and horses which were covered by the chattel mortgage, and by stating to several persons that he was thoroughly satisfied with the transaction. That these acts were done plaintiff himself does not seriously dispute. In fact, as to his giving the orders for the payments and the receipt of the stock and machinery, he enters no denial whatever, and three of these orders were, according to his own testimony, given at least eight days after the principal transaction. One of these orders, indeed, he attempted to have dated back and prior to the time of the giving of the deed, and in this transaction he clearly

shows not merely cunning, but a lack of honesty, which entitles him to but little credit or consideration in a court of equity.

This question of ratification was not one of the questions which were submitted to the jury. It was a matter which, even after the submission to the jury of the specific questions, was reserved for the consideration of the chancellor, and of the chancellor alone. It was controlling in the case. 6 Pom. Eq. Jur. 687. No matter if the plaintiff's will was overcome at the time of the making of the deed, it cannot be claimed that it was overcome at the time of the making of these orders and of receiving these benefits under the contract. This was a matter for the chancellor alone to pass upon. The jury was not involved in it in any manner. Even if all of the questions propounded to the jury had been answered in favor of the defendant, the answers would not have affected the real issues in the case at all, and even though the submission of certain facts or certain issues in an equitable action to a jury may make the action partake of the nature of a law action, in so far as these issues are concerned, it cannot be contended that as to the issues not submitted the power of the chancellor is in any way limited or controlled. It was for him ultimately to say whether the proof was so clear and convincing that the deed should be set aside. Thomas v. Ryan, 24 S. D. 71, 123 N. W. 68; Hogan v. Leeper, 37 Okla. 655, 47 L.R.A. (N.S.) 475, 133 Pac. 190; Bethany Hospital Co. v. Philippi, 82 Kan. 64, 30 L.R.A.(N.S.) 194, 107 Pac. 530. And this in view, not merely of the evidence on which specific questions had been submitted to the jury, but of that the consideration of which had been reserved to him alone.

Even if we were reviewing this case under the latitude of the Newman act, we would hesitate in holding that the proof was clear and convincing of undue influence in the first transaction. On the other hand, we are sure that it conclusively proved a ratification of the transaction, and under circumstances where no pressure was brought by the defendants, and after every opportunity was afforded for deliberation, and even after counsel had been consulted.

The plaintiff himself testified on cross-examination: I am acquainted with John Norlin. He ran the blacksmith shop there. I might have had a talk with him just before I made this settlement,

telling him that I was figuring on making a settlement, and that, if I made it, he could get his money. After I had made the statement, I told him I had settled with the defendants, and that, if he would go to the defendants' bank, he could get his money. I also told him that I had transferred my property to the bank, and received for my interest a thousand dollars in cash, farm implements, and horses sufficient to start farming, etc., getting all of my debts paid. I think he went to the bank and got his money. He never asked me for it any more. I cannot say that he told me that he had gotten it. I should say he had, probably. We talked different times on this proposition afterwards.

Q. Did you tell him that you had made the deal; that you were well pleased with the settlement; that you had made a better settlement than you had expected to be able to make, and that you intended to go to Montana and take a homestead and start farming anew without debts?

A. It would not surprise me if I told him that the day after.

On this point the witness John Norlin testified:

I am a blacksmith at Bowbells.

Q. Did you see Emery up there at that date after he had made settlement with the bank and with Wiper?

A. Yes, he said he had made settlement. It was the next morning—the next day. He did not appear to be intoxicated. He did not have the appearance of a man that had been drinking. I have never seen him take a drink. At that time he owed me some money. At that time I dunned him for it. He said I could go up to the bank and get my money any time I wanted to, because he had made settlement, and Wiper was going to pay it. I did not go just then.

Q. Did you go any time?

A. Yes, I got my money, you bet. The conversation was by Wiper's barn. Mr. Robins was there. Emery said he felt better. He told me about what he had got. Some of the stuff he had got. He said he made settlement and felt better.

The plaintiff Emery again testified: I am acquainted with Mr. Moore, of the Moore Implement Company. In December, 1911, I was owing the Moore Implement Company a bill of something like $25 or $40. I remember telling Mr. Moore I was about to make a deal with Mr. Wiper for the property, and that if that went through I would pay him.

Q. Do you remember telling him that on about the 22d day of December—telling him that you had made a settlement with Wiper and the bank?

A. I met Mr. Moore—

Q. Answer!

A. No.

Q. You don't remember that? Do you remember that on or about the 22d day of December you gave Mr. Moore an order on the First National Bank, the defendant in this action, and A. C. Wiper, wherein you told them to pay M. B. Moore Implement Company $34.75 and charge to my account and signed your name to it?

A. Yes, sir.

Q. That was one of the deals that the bank and Wiper was to pay for you in this settlement?

A. Yes, I gave him an order.

Q. That was on the 22d day of December, wasn't it? Some eight days after you had made the deal with the bank?

A. Sometime after—yes.

Q. At the time of giving the order, didn't you tell him you had made the settlement with the bank.

A. I told him I calculated to break that settlement. At the time I gave him the order I asked him to let me date it back.

Q. And at that time he told you he could not date it back, and even if he did, and were afterwards asked as to the date it was signed, he would have to say on the 22d day of December?

A. I could not say "yes" to that, but possibly so.

Q. You asked Mr. Moore to date this order back?

A. Probably—I think so. I did not give him as a reason for wanting it done that I might have some difficulty with Wiper over the real.

Q. At that time you gave him as a reason for wanting it done that you might have some difficulty with Wiper over the deal, as you thought you might be able to recover some more property from them?

A. No, sir.

On this point the witness Moore testified:

I am manager of the M. B. Moore Implement Company. On December 22d, 1911, Mr. Emery owed us something. At about that time he gave me or the M. B. Moore Implement Company an order on the de-

fendant for the money. At that time he made a request as to whether it was to be dated back. He said he would like to date it back some time, and I asked him how much, and he said he would like to date it back to about the 13th, if I remember right. He said that he was informed that he could get more money out of this deal, and he thought if he would sign the order now it would kind of hurt him from getting any more money. It would show that he had made settlement.

Q. Would you agree to having the order dated back?

A. No, I would not. I told him even though it was dated back, if I was questioned I would not go different from the date.

Q. Is that the same order Mr. Emery admitted on the witness stand the other day?

A. It must be. It was the only order he ever gave me. I do not know whether he had been drinking or not at the time he gave me this order.

Q. Did he say anything to you at any time about having made the deal with the defendants?

A. Yes, sir. He called at my office shortly after he had made the deal. I do not know what day he made the deal, but he said it was yesterday. He expressed himself as being well pleased. He said that certainly was a great load off his mind. I believe that is the words he used,—something to that effect.

Again the plaintiff Emery testified on cross-examination:

I am acquainted with Jens Pederson, of Bowbells. He was engaged in running a mercantile store.

Q. Do you remember going into his store and telling him that you had sold your place to Wiper and made settlement with the bank?

A. Yes, I think I did. About that time I was owing him about $60.

Q. Do you remember telling him that the defendant had agreed to pay your indebtedness and your outstanding indebtedness around Bowbells, and that if he would go to the bank he could get his money?

A. I don't recollect that part about his going to the bank and that he would get his money.

Q. Did you tell him that he would get his money?

A. I would not say. I would not be surprised.

Q. Did he get it?

A. I believe he told me afterwards he got part of it.

32 N. D.—38.

Q. Do you remember telling Mr. Pederson that you had transferred your property to Mr. Wiper and had received certain horses and a thousand dollars, and was to have all debts paid,—do you remember of telling him that?

A. I do not recollect, exactly, but I do not dispute it.

Q. Do you remember telling him that you were well satisfied with the deal?

A. I do not remember that.

On this point the witness Jens Pederson testified:

I remember about the time Emery made a deal and deeded this property to Mr. Wiper. At that time he owed me about $60. I had talked with him a number of times about paying us before that. I talked to him after the deal, on the 15th of December. He came into my store in the evening, and he started to tell me about a deal he made with the bank, so I said to him, "I suppose, then, you will have some money." He said, "That is in the deal. Mr. Wiper agreed to pay your bill."

Q. Did he tell you to go to the bank and get your money?

A. No, he did not tell me to go to the bank because I took that. That was quite enough when Mr. Wiper agreed to pay it. He told me that Wiper had agreed to pay it. I did not go to Mr. Wiper for the money the same day.

Q. Did you at any time?

A. Yes, I did. Yes, sir, Mr. Wiper paid it. Emery said he was well pleased with the deal, and he told me he was to get a thousand dollars and enough to start in farming, a team and some machinery and that the best he could do was to go and get him a new home now.

In addition to this the plaintiff himself testified that he had given similar orders to at least three other persons for payments out of the same fund. It is absurd, in the face of all of this evidence, to contend that there was not merely proof of ratification, but that the ratification was not overwhelmingly proved. Three of these transactions, at least, took place on the 22d of December, and nine days after the signing of the deed and bill of sale. The defendants were not present on any of these occasions, and there was no duress, undue influence, or any other pressure exercised. The question of ratification was not submitted to the jury in any way, and their verdict, even if it had been received,

would have had no weight or influence. The trial court, therefore, did not err in making his findings for the defendant and dismissing the action. 6 Pom. Eq. Jur. 687; 1 Mod. Am. Law, 415; note to Miller v. Sterringer, 25 L.R.A.(N.S.) 601.

The judgment of the District Court is affirmed.