THE BETHANY HOSPITAL COMPANY, *Appellee*, v. NELLE K. HUBBARD PHILIPPI, *Appellant*.

No. 16,386.

SYLLABUS BY THE COURT.

1. JURY TRIAL — *Action by Devisee to Cancel Deed — Insane Grantor—Fraud.* An action by a devisee under a will conceded to be valid to cancel and set aside a deed which the maker of the will was fraudulently procured to execute when he was of unsound mind is equitable in character, and therefore neither party is entitled to a jury trial of the same as a matter of right.

2. EQUITABLE PROCEEDING—*Special Findings by a Jury—Independent Consideration of Testimony by Trial Court.* The trial court, having called a jury to answer special questions of fact, was at liberty either to adopt the answers returned by the jury or to ignore them and make findings of its own, based upon an independent consideration of the testimony.

3. ACCRUAL OF ACTION—*Amended and Supplemental Petition Filed after Action Accrued.* Where the devisee of the will brought the action before the will was probated, and later, when it was probated, filed an amended and supplemental petition, on which the cause of action was tried, the objection that the action was prematurely brought became immaterial.

4. DEEDS—*Insane Persons—Notice—Consideration—Cancellation —Disaffirmance—Parties.* A deed executed by an insane person to one who has knowledge of the mental incapacity of the grantor and who gives no substantial consideration for the property is an absolute nullity. It does not operate to revoke a valid will previously made by the grantor, and a devisee under the will has sufficient interest to justify him in maintaining an action against the grantee to declare the deed to be

void, although there has been no prior disaffirmance of the deed or a tender back of the nominal consideration paid by the grantee.

5. PLEADINGS—*Joinder of Causes of Action.* A petition alleging that the deed was void because of the mental weakness of the grantor and the undue influence exercised upon him while in that condition, and asking to have the deed adjudged to be void, states only a single cause of action.

6. INSANE PERSONS—*Finding Supported by Evidence.* The testimony examined and held to be sufficient to uphold the finding of the trial court that the grantor was without mental capacity to execute the deed in question.

Appeal from Allen district court; OSCAR FOUST, judge. Opinion filed March 12, 1910. Affirmed.

*W. Littlefield, F. M. Harris, W. J. Costigan, W. H. Clark,* and *Campbell & Goshorn,* for the appellant.

*Nelson Case, Wilbur S. Jenks,* and *L. W. Keplinger,* for the appellee; *Ewing, Gard & Gard,* of counsel.

The opinion of the court was delivered by

JOHNSTON, C. J.: This action was brought by the Bethany Hospital Company, to which certain property was devised by the will of Samuel B. Rohrbaugh, to declare a deed to be void and to enjoin the conveyance or encumbrance of the property by the defendant, Nelle K. Hubbard Philippi, who claimed the property under a deed alleged to be absolutely void and to have been fraudulently obtained. It appears that in March, 1903, Samuel B. Rohrbaugh executed a will which, among other devises, gave the hospital company property in the city of Ottawa known as the "Boston store building," worth about $25,000, and it is conceded that the testator was of sound and disposing mind when the will was made. On February 22, 1907, about two months before Rohrbaugh died, he signed a deed which purported to convey the property in question to Nelle K. Hubbard Philippi. This conveyance is attacked by the hospital company on the ground that Rohrbaugh

was of unsound mind at the time it was made, and, further, that defendant and others interested took advantage of the grantor's enfeebled mental condition and by undue influence obtained the execution of the deed. It appears that Rohrbaugh had been successfully engaged in the lumber business in Ottawa for about forty years and until his death, in 1907. During that time he had acquired property worth about $150,000. In the last years of his life the active charge and detailed work of the business, including the payment of bills, the collection of accounts and the signing of checks and contracts, was attended to by Charles H. Constant, who had a partnership interest in the lumber business. Since 1905, however, Samuel R. Hubbard, a nephew of Rohrbaugh and a brother of defendant, who also had an interest, assisted to some extent in the management of the business. In 1882 Rohrbaugh's wife died, when their son was four years old, and the boy made his home with Mrs. Hubbard, a sister of Mrs. Rohrbaugh, until his death about sixteen years later. Rohrbaugh boarded with the Hubbard family most of the time after the death of his wife, and it appears that he was greatly attached to Nelle K. Hubbard, generously contributing toward her education, and was greatly pleased with her progress. In the will mentioned Rohrbaugh gave defendant and the several members of the Hubbard family a number of pieces of real property, which together were worth approximately $55,000, and also considerable personal property. It appeared, too, that he was a member of the Methodist church, to which he had given liberally of his means, and he had made provisions for it and other Methodist institutions in his will.

There is evidence tending to show that early in 1906 Rohrbaugh, then being about seventy-six years of age, and affected with rheumatism and other ailments, became weak of body and feeble of mind, and that his mental degeneration gradually increased until his

death.  On February 20, 1907, a proceeding to inquire into his mental condition and for the appointment of a guardian to take care of him and his estate was begun on the application of some of his neighbors who were members of his church.  According to much of the testimony he did not comprehend the nature of the proceeding and seemed to understand that he was under arrest, and was therefore very much angered at those who instituted it and greatly agitated because of it.  A hearing of the application was had on February 26, 1907, but the jury failed to agree.  While the proceeding was pending, and while Rohrbaugh was surrounded by the Hubbards and witnesses chosen by them and their attorney, he signed deeds prepared for him which on their faces conveyed to defendant and other members of the Hubbard family nearly his entire estate, for a nominal consideration and his love and affection for the grantees.  Shortly after the execution of the deeds and the hearing mentioned Mrs. Hubbard took him to Excelsior Springs, and there he rapidly grew weaker, and died on April 15, 1907.

Before the will had been offered for probate, and on April 24, 1907, this action was begun.  The will was probated on April 29, 1907, and on May 3, 1907, an amended and supplemental petition was filed setting forth a copy of the will and the probate of the same, and under it the case was tried.  The defendant answered setting up her deed from Rohrbaugh, and asking that her title be quieted as against the plaintiff and that it be barred from claiming any interest or estate in the property.  The defendant demanded a jury trial as a matter of right, which was denied.  Some special questions, however, were submitted to a jury to aid the court; but that jury failed to agree and another was called, to which issues of fact were referred, but the answers returned, which in the main were favorable to defendant, were not adopted by the court.  Upon in-

dependent consideration of the evidence the court made findings of its own.

Although demanded by the appellant she was not entitled to a jury trial. The action was equitable in its nature, brought to declare a deed void and to remove a cloud upon the title which it is claimed passed to appellee under the provisions of the will. In connection with this relief, an injunction against transferring or encumbering the property by the grantee in the deed was asked. The appellant in her answer recognized the equitable character of the proceeding and asked to have her title quieted as against the claim of appellee. In such a case a jury may be called to answer special questions submitted to it, but the answers of the jury are not binding on the court. It may ignore them and upon independent considerations make findings of its own, as the trial court did in this instance. (*Medill v. Snyder,* 61 Kan. 15.)

There is a contention, however, that appellee did not have such an interest in the property as warranted it in maintaining an action against appellant. It is first argued that the will was not probated when the original petition was filed, but this is accounted for in the averments of the pleading. The question is not a practical one, as the amended and supplemental petition was filed after the will had been probated; and, besides, the due execution of the will was not in controversy. The probating of the will furnishes evidence of an effective gift and the transfer of title, and the will when probated takes effect by relation from the time of the testator's death. It is earnestly argued that the deed, being valid on its face and at most only voidable, operated to revoke the will; that if a fraud was committed on Rohrbaugh he was the only party who could complain, and that one subsequently acquiring an interest in the property can not set up the fraud of appellant in obtaining the conveyance. Rohrbaugh, it is said, was at liberty to forgive the wrong, and in any event his right to contest the

validity of the deed was incapable of transfer to any-
one.   It is further contended that there was no dis-
affirmance by Rohrbaugh, or anyone in his behalf, al-
though there was ample time for such action between
the execution of the deed and his death, and that dis-
affirmance must precede the bringing of an action.

It is true that while the testator lives a gift or devise
is only a possibility, and, further, that a will only
speaks from the time of the testator's death.   It is also
true that one who attacks a deed or other instrument of
revocation must have a vested interest in the property.
On the theory of appellee it had an interest when the
action was brought.   It contended and the trial court
found that the deed was an absolute nullity.   If Rohr-
baugh had no capacity to execute a deed, no property
was conveyed.   If the instrument signed was an utter
nullity, Rohrbaugh was the owner of the property at
the time of his death.   If the title of the property was
in Rohrbaugh when he died, it became subject to the
provisions of the will and passed to the appellee.   The
theory of the appellee was, not that the deed was merely
voidable, but that it was utterly void, and hence the
rules suggested by appellant are not applicable.   If the
deed did not transfer the title from Rohrbaugh, then
appellee acquired the complete title to the property
upon the death of Rohrbaugh, and also the right to
bring an action to have the deed declared void.   This
question was raised and directly decided in *Waller v.
Julius*, 68 Kan. 314.   That was an action to cancel a
deed made without consideration by one of unsound
mind.   Waller claimed title under an agreement with
the grantor and her husband to the effect that if she
cared for them during their lives the property would
become hers.   After the death of her husband the
grantor conveyed the property to Julius.   Waller
brought the action, and it was argued that she had no
interest and no standing to challenge the deed for fraud

or want of consideration.   The court met this claim by saying:

"The action is not an attack upon a deed voidable for fraud and want of consideration, but an effort to clear the record of an apparent deed that is in fact no deed at all, because made by an insane grantor to a grantee who knew of her incapacity and who gave nothing for it.   True, it is said that as a general rule a deed made by a person of unsound mind who has not been judicially declared insane is not wholly void.   But this rule grows out of practical considerations and is for the benefit of innocent grantees for value.   One who takes a deed, paying nothing for it, and knowing the grantor to be insane, is not within its reason and is not protected by it.   The caution with which this court has held that the deed of an insane person can ever be treated otherwise than as absolutely void confirms this."   (Page 316.)

The case of *Gribben, Guardian, v. Maxwell,* 34 Kan. 8, cited by appellant, belongs in an exceptional class of cases and lays down the rule that one who in good faith purchases property from an insane person before there is an inquisition, without knowledge of the insanity, for a fair and reasonable consideration, no advantage being taken by the purchaser, does not lose everything, and the guardian of the insane person is not permitted to recover the land without returning the consideration. This rule is applied for the protection of an innocent party, and to prevent a representative of the insane person from obtaining and keeping the property as well as the consideration honestly paid.   Even in that case the court took pains to state the general rule to be that "the contract of a lunatic is void *per se.*   The concurring assent of two minds is wanting.   'They who have no mind can not "concur in mind" with one another; and, as this is the essence of a contract, they can not enter into a contract.' *Powell v. Powell,* 18 Kan. 371." (Page 9.)   The case of *Leavitt, Guardian, v. Files,* 38 Kan. 26, belongs in the same class, and applies the rule that if a contract is entered into in good faith and no

advantage is taken of the person of unsound mind it would be inequitable to allow him to recover the property and retain the price paid by the purchaser.

Strictly speaking, a party dealing with a person *non compos mentis* does not recover on the contract itself, but, having dealt fairly with the person of unsound mind and in ignorance of his incapacity, he is deemed to be entitled to that with which he has honestly parted and is not required to surrender both the property and its price. The present case, however, does not come within any of these exceptions to the general rule. According to the averments and much of the evidence no substantial consideration was paid. The conveyance was not obtained in good faith by the grantee. She had knowledge of the incapacity of the grantor. She did take advantage of his mental weakness and by undue influence procured the execution of the deed. If these facts are established, the deed is absolutely void. Even if there had been good faith there was no consideration to return, because, as we have seen, only a nominal consideration was paid. If the deed had no existence or force, it had no effect on the will, which is admitted to be valid; and so it has been said that "if the deed . . . is void" or inoperative as a deed "it should not be allowed an incidental operation by way of revocation." (*Graham v. Burch,* 47 Minn. 171, 175.) A formal disaffirmance was not a prerequisite step to the bringing of the action to get rid of the void conveyance. Disaffirmance by one without mental capacity would have been unavailing, and so far as appellee is concerned it appears to have taken prompt action after the death of the testator and the passing of the property to it.

Error is assigned on the refusal of the court to require appellee to elect upon which cause of action it would rely. The appellant's theory appears to be that the petition sets out two causes of action; the first, that the grantor of the deed was without mental capacity, and the second, that the execution of the deed was

procured by undue influence; and, further, that these are inconsistent claims. There was in fact but one cause of action—one main object sought, and that was the getting rid of the void deed. Only one deed was involved, and it was alleged to be void because of the mental weakness of the grantor and the undue influence exercised upon him in his weak condition. These grounds may coëxist and are not inconsistent in the sense that will prevent proof showing both. Each is a reason for adjudging the deed to be a nullity, and together they give but one right of relief and constitute but one cause of action. (*Bank v. Woodrum*, 60 Kan. 34; *Howard v. Carter*, 71 Kan. 85; *Lattin v. McCarthy*, 41 N. Y. 107; Maxwell, Code Plead., p. 96.)

Two objections to rulings on testimony are briefly presented, but neither of them is deemed to be material. It is said that Judge Smart, the executor of the will, was permitted to relate conversations with Rohrbaugh which occurred when the relation of attorney and client existed between them. We find no basis in the evidence for holding that such relation then existed. The other objection is the exclusion of the testimony of a physician, called to treat Rohrbaugh at Excelsior Springs, relating to his condition at that time. The doctor was asked and not allowed to give his opinion as to Rohrbaugh's sanity, based on information outside of what he had obtained in a professional way. It would have been very difficult to have found a line between the professional and nonprofessional information of this witness, and it is very doubtful if any of the proposed testimony would have been competent. Each party produced a great volume of testimony relating to the mental condition of Rohrbaugh, and even if any of the testimony of the doctor was other than confidential or could have been brought within the region of competency its exclusion can hardly be regarded as material error.

The remaining question as to the mental condition of Rohrbaugh when the deed was executed has been determined upon the testimony of those who were near to and associated with him in the last year of his life, as well as upon the evidence given by experts who testified as to the mental disease with which he was afflicted. While there was a sharp conflict in the testimony on this question there was a great deal of evidence of a convincing character tending to show incapacity. The findings of the trial court indicate the nature of his malady and the stage to which it had progressed when the deed was signed. Among other things the court found:

"(11) That the mental malady with which said Samuel B. Rohrbaugh was afflicted seemed progressive in character and grew worse, showing a gradual but sure impairment of the mental faculties, more especially those of memory, will power, concentration of thought and judgment, such features and symptoms being manifested as early as February, 1906, and gradually growing worse until the same culminated in his death. He spent much of his time during the last months of his life sitting in his lumberyard office; he would sit in a posture inclined forward, have a vacant expression on his face, and seemingly totally oblivious to surroundings; he would awake from such stupors and would make attempts to transact business, but would immediately forget prices and quantities and qualities. This condition of mind, by September, 1906, manifested itself in his becoming unable to dress himself unaided. He became subject to delusions, at times imagining that burglars had been in his room at nights, and having conflicts with them; at times imagining seeing men and teams and other objects where none such existed. On different occasions he became lost, and had to be assisted and guarded in going to and from his meals, only a short distance and along a route long and familiarly known to him for years before; on different occasions he wandered into the house or onto the premises of neighbors adjoining his boarding place. On one occasion during the month of November, 1906, he imagined he had been robbed or there were burglars in his room, and opened his windows at night, making

an outcry. Soon after these demonstrations on the part of Samuel B. Rohrbaugh, Mrs. Ida Hubbard and her family took him, the said Samuel B. Rohrbaugh, to their home, where he continued to room until about February 1, 1907, when Mrs. Hubbard and her daughter, Nelle K. Hubbard, defendant, with Samuel B. Rohrbaugh, moved into the new residence above mentioned. So far as the evidence discloses the husband of Mrs. Hubbard was home very little during the last year of Mr. Rohrbaugh's life. During the month of December, 1906, the acts and conduct, as before mentioned, of the said Samuel B. Rohrbaugh became so pronounced that the Hubbard family procured a man to come to their home at night to guard Samuel B. Rohrbaugh and care for him at night, and this person remained to wait upon the said Samuel B. Rohrbaugh by night for about two months, or until about the 20th of February, 1907; and during said period, to wit, during the two months preceding the 20th of February, 1907, said Samuel B. Rohrbaugh in his enfeebled and diseased condition of mind imagined he saw . . . imps and devils in his room; he became careless in the use of his tobacco, although formerly he had been clean, and was unable to wait upon himself in the toilet room without direction, mistaking the bath tub for a urinal. However, the evidence fails to disclose that he was violent, but was easily persuaded and tractable with those with whom he was acquainted. For two or three months prior to the date of the execution of the deed in controversy in this action the mental condition of the said Samuel B. Rohrbaugh became such that on different occasions he was unable to recognize property belonging to himself upon which he had erected costly improvements, denying that it belonged to him; on one occasion, pointing out his own lumberyard as that of a rival in business; and though having been familiar with the fact of the death of an associate and friend of years gone by he made inquiries concerning the health of the deceased; having received payment of a claim in litigation, he made inquiry of the attorney on the next day after such payment as to the progress of the case; seemed to lose power of location of places familiar to him; mistaking the day of the week and the hour of the day; though Samuel B. Rohrbaugh had large experience in building, and was thoroughly conversant with the prices of lumber and the cost of building, yet

at the time the building referred to in finding number 10 was just about completed he had no knowledge as to the cost of the building, and supposed it to be only about $5000, although, as before stated, it cost about $17,000, and, also, while he had personal knowledge that stone was contracted for to the amount of $1000 for certain portions of the work in part of the house, and after a considerable part of the stones had been actually used in the building and the greater part of the remainder was on the ground, he was entirely ignorant or forgetful of the fact and insisted on getting wood for the same purpose."

In other findings the court stated:

"(22) That upon the day on which the deed in controversy, as well as the other deeds, were executed, to wit, February 22, 1907, Samuel B. Rohrbaugh was suffering from such physical and mental weakness as to be unable to dress himself properly without assistance, and it would have been unsafe and unwise to permit him to go to the closet or out upon the streets without an attendant; that his memory and mental powers were so impaired and weakened as to incapacitate him from remembering his prior wills or the provisions thereof; that he was mentally incapable of concentrating his attention upon such matters, or his relations to the interests provided for in said will or his relations thereto, or acting with intelligence with regard to the matters therein contained; that he, the said Samuel B. Rohrbaugh, was not on said day of sound mind and memory.

"(17) That on the day succeeding that of the execution of the deed to defendant the said Samuel B. Rohrbaugh, leaving the house unattended, became lost on the streets of Ottawa, Kan., and was brought back by parties who, together with the Hubbard family, were in search of him, and on the third or fourth day after the execution of the deeds the said Rohrbaugh pointed out an imaginary one-legged chicken which he thought he saw running in the parlor in which he was seated, and also referred to an imaginary packing house in the city of Ottawa, Kan., where he then was, and stated that he used to work there thirty-five years ago, although in fact there was no packing house there and the only time and place he ever worked in any packing house was in Springfield, Ill., forty years ago."

While the credibility of the witnesses and the probative force of their testimony were questions for the trial court, and while its findings based on competent testimony are binding on this court, a reading of the testimony as written in the record satisfies us that it not only supports but that it abundantly sustains the finding of incapacity. That being established, the deed in question is a nullity, regardless of whether undue influence was exercised upon the grantor by anyone; and hence the judgment of the district court must be affirmed.

BENSON, J., not sitting.