No. 38,479

HENRY C. HANDLEY, *Appellant,* v. CLIFFORD M. HANDLEY, GLADYS
NAOMI HANDLEY, HENRY C. HANDLEY, SR., *Appellees.*

(243 P. 2d 204)

Opinion filed April 12, 1952.

*L. M. Cornish, Jr.,* of Topeka, argued the cause, and *Ralph F. Glenn,* of
Topeka, was with him on the briefs for the appellant.

*Edward Rooney,* of Topeka, argued the cause, and *Harry Logan, Jacob
Dickinson* and *David Prager,* all of Topeka, were with him on the briefs for the
appellees.

The opinion of the court was delivered by

HARVEY, C. J.: This was an action to set aside a deed as being
void. The trial court sustained a demurrer to plaintiff's evidence
and he has appealed.

Clifford M. Handley is a twin brother of the plaintiff. He will
be referred to as defendant. Henry C. Handley, Sr., intervened
to protect his rights, which he alleged to be a life interest in the
property. Since that is not seriously in dispute we need not men-
tion it further.

In his petition, filed December 10, 1950, plaintiff alleged that
prior to October 11, 1948, he was the owner of a described farm in
Shawnee county, then of the approximate value of $9,000, which
was mortgaged to the State Bank of Meriden upon which there
was an unpaid balance of about $2,500; that on October 11, 1948,
he was not indebted to defendants; that he was ill and was in a

disturbed and confused condition, which fact was known to defendants; that a confidential relation existed between him and defendants and that he resided at the home of defendants part of the time; that on October 11, 1948, defendants induced him to sign a general warranty deed to them for a stated consideration of one dollar and other valuable considerations upon the oral statements and representations made by defendants to plaintiff that if plaintiff would execute the deed and convey the property to them defendants would hold the property for the benefit of plaintiff and would protect the equity and interest of the plaintiff therein, and that defendants would reconvey the title of the property to plaintiff when plaintiff would request defendants to do so; that relying upon the oral statements and representations made by defendants plaintiff executed the deed, which defendants recorded October 18, 1948, in the office of the register of deeds of Shawnee county; that no consideration was paid by defendants, or any of them, for the deed and no revenue stamps were attached thereto; that about March 19, 1949, defendant signed a complaint, filed in the probate court of Shawnee county, charging plaintiff to be insane, which caused the plaintiff to be committed to the Topeka state hospital as a mental patient, where he was detained until June 10, 1949, when he was released; that on January 3, 1950, defendant caused another complaint to be filed in the probate court of Shawnee county charging that plaintiff was insane, as a result of which he was adjudged insane April 13, 1950, and committed to the state hospital, where he remained as a patient until June 10, 1950, at which time he was restored and released; that "plaintiff now has full legal rights, and no guardian is now appointed or acting for him"; that since June 10, 1950, he has made frequent oral demands upon defendants for a reconveyance to him of the title to the property, but that defendants have failed and refused to do so although they orally admitted that plaintiff has an interest therein, and that defendants orally informed plaintiff that they cannot be compelled to reconvey the title to him since more than one year has elapsed since the conveyance was made, all of which are contrary to the statement made by defendants at the time they obtained the deed; that the deed executed by plaintiff to defendants on October 11, 1948, was made without consideration, was obtained by misrepresentation and fraud of defendants, as aforesaid, at a time when this plaintiff was not in full possession of his mental faculties and the power to reason

for his own protection, all of which was known to the defendants. It was further alleged that defendants have received and retained plaintiff's share of the income from the farm and have refused to account to plaintiff therefor. The prayer was for judgment setting aside the deed as void and for an accounting.

To this petition defendants filed an answer in which they admitted some of the allegations of the petition, which need not be detailed specifically; denied others, which need not be detailed; alleged that prior to October 11, 1948, plaintiff was indebted to them for certain items; alleged that at all times since October 11, 1948, H. C. Handley, Sr., and wife had lived upon the real property in question; that defendants had received some income from the real estate for the years 1949 and 1950 and had paid a number of expenses in connection with the farming, had made necessary repairs and lasting improvements upon the premises, have paid the taxes on the real estate and made payments of interest and principal on the mortgage thereon, a detailed account of which was attached as a part of the answer; and further alleged:

"That at the time said deed was delivered to the defendants, the defendants did verbally agree that if plaintiff would within one year, from said date, pay to them the amount of money he was then owing to the defendants, and each of them, and such additional sums as they had paid out, for repairs, taxes, improvements, interest and principal payments on said mortgage indebtedness, they would within said time, re-convey said real estate to the plaintiff."

It was further alleged that plaintiff never paid, or offered to pay, for any of those items and had never requested defendants to re-convey the property within the time mentioned; that a part of the land was rented, naming defendants; that the parents of the brothers are still residing upon the real property and have an interest in the real estate; that they are advanced in years and have very little earning capacity; that defendants are interested in protecting the rights, peace and comfort of the parents during their lifetime and have been contributing to their support, and that if the deed executed, acknowledged and delivered to defendants by plaintiff was canceled, as prayed for by plaintiff in his petition, the same would be unjust and not equitable to the defendants. The prayer was that the judgment prayed for by plaintiff should be denied and that defendants have judgment for costs. To this answer plaintiff filed a reply, which is a general denial of the allegations contained in the answer except those which specifically admit allegations of the petition, and deny the correctness of the accounting filed by

defendants, and request that they be placed on strict proof thereof.

When the case came on for trial before the court on March 1, 1951, plaintiff offered in evidence a written agreement dated January 20, 1948, in which plaintiff agreed to convey to his father, the intervenor here, an estate for the life of his father and mother, or the survivor of them, to an undivided one-half interest in the real estate here involved, also the deed of a later date from plaintiff to the intervenor to carry out the provisions of this agreement. These instruments are not before us and the controversy raised by the pleadings between the intervenor and the plaintiff, as to whether this contract and deed were for a life estate to all of the property or only an undivided one-half of it, was not passed upon by the trial court and is not in issue here. There was also introduced in evidence the probate court files of the proceedings initiated March 19, 1949, and July 3, 1950, which resulted in plaintiff's commitment to the Topeka state hospital. Defendant's objections to those files were overruled upon the ground that they went more to the weight to be given to the proceedings than to their admissibility. Plaintiff called an experienced real estate broker who had examined the property and given it as his judgment that it was of the reasonable market value of $9,100 in October, 1948. Plaintiff offered the medical records of the Topeka state hospital covering the two periods plaintiff had been a patient in that institution. Defendant objected to their introduction and the objection was sustained.

Plaintiff called as a witness a competent physician, Dr. John Crary, who examined the plaintiff on September 25, 1948. On that date plaintiff was taken to the doctor's office by defendant, who arranged for the appointment and who later paid for the treatment. The purpose was to have the doctor treat plaintiff to get him over a drinking spree of three or four weeks' duration, during which time plaintiff had been carrying a revolver and exhibited suicidal and homicidal tendencies. From the doctor's examination of plaintiff and his history, which he learned from plaintiff and defendant, the doctor concluded plaintiff was an alcoholic and advised defendant to keep him away from intoxicants. He thought plaintiff was incompetent to transact business. The doctor was of the opinion that there was something more the matter with plaintiff than being an alcoholic and advised that he thought plaintiff was a psychiatric problem, that he should have psychiatric treatments and advised that the best hospitalization for him was at the

state hospital. The doctor did not find that he had any delusions or hallucinations. The doctor testified:

"My opinion when I saw him at that time in '48 he had been drinking, I felt that underlying the difficulty was a condition known as schizophrenia which is a mental condition . . . accompanied by extreme nervousness, depression, difficulty in making decisions, sometimes very violent, violence of which can take its effect upon other people, upon himself. . . . Now that is my opinion at that time, whether that was proved out later during his hospitalization I think you probably could find from the Hospital records."

At that time there appeared to be no hostility between plaintiff and defendant. Defendant treated plaintiff as a normal brother and was there to be of assistance to him, and plaintiff appeared to be depending upon defendant. From his examination of the plaintiff and from the history obtained at that time the doctor made a notation of his having been a vagabond. The doctor saw the plaintiff a few days later, and on several occasions within the next two weeks plaintiff dropped in to see the doctor and visit with him. The doctor was asked and answered the following question:

"Q. Doctor, there are lots of schizophrenics running around holding responsible positions in high places of responsibility, aren't there?

"A. Yes, that's right. . . . There are a lot of them in the State Hospital too."

William Landis, called as a witness, testified that he operated a bakery; that plaintiff had worked for him in Topeka and before he moved to Burlington; that plaintiff worked for him through July and August, 1948; that sometime in July he borrowed $1,000 from plaintiff and gave plaintiff his I. O. U.; that plaintiff quit working for him about September 1 and soon thereafter was drinking heavily, and on one occasion told the witness that he had paid plaintiff the money he had borrowed, insisting that the payment had been made at a tavern where both of them were. The witness said it had not been paid. Plaintiff also told a story of running over a man and dragging him under his car, which proved to be inaccurate. The witness thought plaintiff incompetent at that time. The witness testified that on October 20, 1948, he paid plaintiff by check the $1,000 which he owed and that plaintiff tore up the I. O. U. He thought plaintiff competent when the payment was made. Three other witnesses who saw plaintiff early in September concluded from his appearance and what he said and did that he was incompetent to transact business.

Plaintiff in his own behalf testified that he was forty-one years

old; was reared in Topeka and quit school in the seventh grade; worked as a baker for the Jordan Bakery several years; that he began farming with his father about 1938; that they farmed for a time ten miles north of Topeka and one year near Meriden; that he bought the farm in question about the first of August, 1946, paid 6,900 and some dollars for it, $4,300 in cash, and had a mortgage on the place with the Meriden State Bank of a little more than $2,500; that he and his parents went in possession of the farm on March 1, 1947; that he was having some trouble with his father, who sued him for a half interest in the farm, as a result of which they entered into the agreement of January 20, 1948, a copy of which was introduced in evidence at the beginning of the trial; that at the time of the trial his father was seventy-four and his mother seventy-five years of age; that on March 1, 1948, they had a sale of their farming equipment and livestock, as a result of which he received $1,400 in cash; that he went to California about April 1, 1948, and returned about five weeks later; that he worked for Mr. Landis in the bakery, at first in Topeka and then at Burlington, where Mr. Landis moved; that he did not remember signing the deed in question but recognized the signature as his; that he remembered in a hazy way that he and his brother, the defendant, were in the Meriden State Bank and talked with Karl Lehman about the deed; that he also talked with his father and mother about deeding the land to his brother. He was asked and answered the following questions:

"Q. Do you remember any conversations that you had about this farm at this time or around this time with your brother? A. Why yes, I was going to Deed it over to him and he said he'd Deed it back anytime I wanted it and I was supposed to pay him back the money he put out on it.

"Q. Do you remember when that conversation took place? A. Along in September or October, somewhere along there. . . .

"Q. As you recall the agreement now what was it? A. Well, anytime I wanted it back all I had to have done was paid him back the money he had spent on it and he'd deed it back to me.

"Q. That is what you remember about it? A. Yes."

He testified that there was no cash consideration at the time the deed was executed; that $100 was due on the principal on the mortgage each time the interest was due.

"Q. Can you describe in any fashion at all your mental or physical condition at that time? A. Not much, I wasn't sleeping very well, kind of thought I was all right myself."

He testified he had been a patient in the Topeka state hospital

from March, 1949, until the 10th of June and again from January, 1950 to the 10th of June, on which date he was released and restored.

The witness further testified that he and his brother were on friendly terms; that he consulted with his brother at various times; that the brother and his wife would come out to the farm about once a week and he came into town and visited with the brother and stayed all night at the brother's house; that they talked about the farm on many occasions. His attention was called to portions of his petition which alleged in substance that his agreement with his brother was that he would deed the farm to his brother, who "would hold the title to said property for the benefit of this plaintiff, and would protect the equity and interests of this plaintiff therein." Plaintiff testified that was the way he understood it and that he expected his brother to keep up the payments on the mortgage and to pay the taxes. The plaintiff had gone to the bank of Meriden and learned that the payments on the mortgage had been kept up, and while he did not get the exact figures on how much had been paid he understood it was between $500 and $1,000. He also knew that defendant had made some improvements on the property by putting in electricity, repairing and painting buildings, etc., but he did not know the amount expended for those purposes. He further testified that sometime after he was restored and released from the state hospital on June 10, 1950, he spoke to defendant about reconveying the property, and defendant told him that the doctors at the hospital had advised against it, and at a later time told him that the year had passed.

It will be noted that the conditions for a reconveyance, as testified to by the witness, were substantially the same as had been alleged by defendant in his answer except on one point. Defendant's answer had a one year limit of time for the repayment.

In plaintiff's petition he did not offer to repay defendant anything for payments made by him on the mortgage, taxes, or any other item, to protect his interests; neither did he testify that he offered to pay, or was willing to pay, any of those items in order to have the reconveyance. The trial court sustained a demurrer to plaintiff's evidence, and we think properly so.

Attached to defendant's answer was an itemized statement of moneys paid out for taxes, for interest and principal upon the mortgage, and for permanent and lasting improvements on the farm of approximately $2,000 more than defendant had received from

crops. This was a suit in equity. Had plaintiff asked that the court determine the amount defendant had paid out and offered to pay the same as a condition of reconveyance of the property he would have had some standing in court. But he did not do that. The action was to set aside the deed as being void, and he attempts to sustain that view in this court. To do so would not be in harmony with plaintiff's testimony and would be inequitable in the extreme.

In this court plaintiff cites *Waller v. Julius*, 68 Kan. 314, 74 Pac. 157, where it was held:

"A deed executed without consideration by a person who is in fact insane, although not judicially declared so, to a grantee who knows of his incapacity, is void, and may be set aside at the suit of one who is in possession of the property under a claim of ownership."

That case reached this court by appeal from an order sustaining a demurrer to plaintiff's petition, which, briefly stated, alleged that the deed was without consideration and the grantor at the time of making it was of unsound mind and incapable of transacting any business whatsoever and did not know what she was doing, which facts were known to the grantee. Other facts were alleged as to plaintiff's interest in the property and her right to maintain the action. By reversing the trial court this court simply held that plaintiff was entitled to a trial upon her petition. Possibly a similar holding would have been made if a demurrer had been filed to the petition in this case. However, that was not done. An answer was filed and plaintiff offered all his testimony, and his own testimony made it clear that he was not to have the property reconveyed to him until he paid the grantee what he had paid out.

Counsel for appellant also cite *Hospital Co. v. Philippi*, 82 Kan. 64, 107 Pac. 530, where among other things it was held:

"A deed executed by an insane person to one who has knowledge of the mental incapacity of the grantor and who gives no substantial consideration for the property is an absolute nullity. . . ."

That case is materially different from the one before us. In that case a well-to-do business man, in March, 1903, when it was conceded he was of sound and disposing mind, executed a will in which he devised certain real property to the hospital. In February, 1907, about two months before he died, the testator executed a deed to the same property. The hospital brought a suit to set aside the deed, alleging it was void because of the mental weakness of the grantor and the undue influence exerted upon him while in that condition. Issues were joined and a trial was had, in which the

trial court made findings of fact (pp. 73 to 75) and set aside the deed. This judgment was sustained. In this case, while there was a general allegation of fraud, no facts were stated upon which to base such an allegation. The evidence made it clear that there was no fraud in the procuring of the deed. The brothers were friends. They talked frequently about this deed, not only between themselves but with their parents. It was executed under an oral contract which stated its purpose. Plaintiff's only complaint is that defendant did not reconvey it to him, but under plaintiff's own statement of the contract to reconvey plaintiff had not attempted to comply with it. Neither can it be said that this deed was executed without consideration. It is true the evidence indicated no cash passed at the time of the execution and delivery of the deed, but the grantee did assume a substantial obligation, which plaintiff's testimony disclosed he performed. We have examined the other authorities cited by appellant and find none of them to be controlling.

In *Ash v. Wulf*, 127 Kan. 301, 273 Pac. 432, the rule is thus stated:

"An executed contract of a person of unsound mind who has not been adjudged insane nor placed under guardianship is voidable only, and not void."

This harmonizes with the statement in American Jurisprudence in the article on Insane and Other Incompetent Persons, section 56, which reads:

"The weight of authority supports the view that the contracts and conveyances of an insane person, made prior to an adjudication of his insanity, are voidable to the extent that, subject to certain conditions, they may be disaffirmed by him, but that they are not void, and they remain in full force and effect until disaffirmed." (Citing many authorities.)

In 17 C. J. S. 484, the rule is thus stated:

"Under the general, although not universal, rule, contracts of mental incompetents are voidable but not absolutely void. In some jurisdictions the void or voidable character depends on the degree of the mental incapacity." (Citing, among other cases, *Ash v. Wulf*, supra.)

And on the same page the contracts for an intoxicated person are similarly construed.

In *Mills v. Shepherd*, 159 Kan. 668, 157 P. 2d 533, it was held:

"The test of mental capacity to contract or to convey property is whether the person possesses sufficient mind to understand, in a reasonable manner, the nature and effect of the act in which he is engaged."

Compare a somewhat different wording in the citations on page 673 of the opinion.

In this case there is no controversy about the execution and delivery of the deed sought to be set aside. That is alleged in plaintiff's petition and admitted in defendant's answer. The oral agreement with respect to the execution of the deed was alleged, in part, in plaintiff's petition, more fully testified to by plaintiff as a witness, and alleged in defendant's answer with one slight variation. The thought Doctor Crary had when he examined plaintiff on September 25, 1948, that plaintiff was a psychiatric problem and should have psychiatric treatment at the state hospital, appears to have been well founded, but such treatment was not found to be necessary until about six months later. In the meantime Mr. Landis thought plaintiff competent to transact important business on October 20. The doctor's tentative view that plaintiff's difficulty was a condition known as schizophrenia, which would have to be proved later during his hospitalization, appears not to have been well founded, at least not in a serious degree, for after two short periods of treatment in the state hospital plaintiff was released as being "restored." From any point we view this record we are forced to get back to plaintiff's own testimony respecting his agreement with his brother to the effect that plaintiff would convey the property to defendant by a deed; that defendant would protect his interest in it and would convey it back to plaintiff when plaintiff paid defendant what he had paid out, and that he has not attempted to make such payment.

Appellant complains of the ruling of the court sustaining defendant's objection to the introduction of the record of the Topeka state hospital. After the demurrer to the evidence was sustained by the court plaintiff filed a motion for a new trial. At the hearing of that motion the record of the Topeka state hospital covering the times in question was not produced, as required by G. S. 1949, 60-3004, hence the ruling is not before us for review.

The judgment of the trial court is affirmed.