George **NEVIN**, Guardian of the person and estate of Viola M. Nevin, an incompetent person, Appellant,

v.

Jay A. **HOFFMAN** and Hazel I. Hoffman, his wife, Appellees.

George **NEVIN**, Guardian of the person and estate of Viola M. Nevin, an incompetent person, Appellant,

v.

Jay A. **HOFFMAN** and Hazel I. Hoffman, his wife, Appellees.

Nos. 456–69, 457–69.

United States Court of Appeals, Tenth Circuit.

Sept. 2, 1970.

Rehearing Denied Oct. 29, 1970.

James W. Sargent, of Jochems, Sargent & Blaes, Wichita, Kan. (Bruce W. Zuercher and Richard A. Loyd, of Jochems, Sargent & Blaes, Wichita, Kan., on the brief), for appellant.

Harry E. Robbins, Jr., of Gamelson, Hiebsch, Robbins & Tinker, Wichita, Kan., (Brainard L. Anderson, Tribune, Kan., on the brief), for appellees.

Before ORIE L. PHILLIPS, BREITENSTEIN and HILL, Circuit Judges.

HILL, Circuit Judge.

This appeal involves a diversity suit brought by appellant Nevin for cancellation of a deed under which appellees hold title to a section of land in Greeley County, Kansas. The case was tried to the court without a jury, and the trial judge made findings of fact and conclusions of law. On those findings and conclusions, the trial judge entered an order allowing appellant ninety days to provide for the payment of $67,000 to appellees, at which time the court will declare appellees' deed null and void. It was further ordered that in the event that appellant failed to provide for the payment to appellees, title to the land will be quieted in appellees. Appellant takes this appeal primarily asserting that the trial judge erred by failing to hold that the deed was absolutely void even as against a bona fide purchaser.

The facts are long and involved but not in dispute. Viola Nevin, an elderly widow, resided alone in San Dimas, California. In 1960, she hired one Billy Earl Dacus, who was then a high school student, and one Marvin Taylor to do yard work around her home in San Dimas. They worked for her until 1964; in January of 1966 Dacus and Taylor returned to work for Viola as general handymen. Dacus assisted her in paying bills, running errands, and conducting her business affairs. Her business affairs included ownership of property in several states including a section of land in Kansas. Soon Dacus was in charge of her savings and checking accounts, and had free access to her business papers.

Viola Nevin had five sons, one of whom is appellant George Nevin, her recently appointed guardian. Appellant Nevin lived nearby his mother and although he visited her often he never met Dacus and Taylor and was unaware of Dacus' influence over her. He was aware of her mental lapses and he tried to persuade Viola to go into a hospital or rest home, or to live with him or a brother; but Viola refused to leave home and did not want anyone to stay with her. Since Viola had her "good days" her son did not insist that she be supervised.

After Dacus gained possession of Viola's bank books, he found it easy to convert large sums of money from her checking and savings accounts. Viola's signature was obtained by various tricks and subterfuges, frequently by telling her that her signature was needed by Dacus on a piece of paper which was represented to be a school reference. Moreover, Viola was in a declining men-

tal state and the evidence is ample that she did not understand the meaning of the acts she was doing at Dacus' behest.

These were the circumstances when on March 19, 1966, Dacus obtained Viola's signature on a deed which purportedly conveyed her land in Kansas to Dacus. Viola's signature was obtained, according to Dacus, by representing to her that the deed was some sort of paper that Dacus needed for school. At the time that Viola signed the deed she had just awakened and did not have her glasses on; she simply signed where Dacus placed her hand and without further examining the document. Subsequently, Dacus realized that her signature on the deed must be notarized, so he took her to a notary public telling her only that she had to have some papers notarized. According to Dacus' description of that occasion, she was childishly excited at the opportunity to go into town, and when they got to the notary's office she was interested only in the printing presses which were running in the back of the notary's shop. Dacus further stated that he did not think she knew what was happening at the notary's office, and she simply signed wherever Dacus told her to sign. Her signings included an acknowledgment of her signature on the deed and a letter of recommendation for Dacus.

At the time when Viola signed the deed and when she acknowledged her signature on the deed, she had not been adjudged incompetent. But the trial judge found that at these times she did not possess sufficient mind to understand, in a reasonable manner, the nature and effect of the act in which she was engaged.

Having obtained the deed, Dacus had it recorded in Greeley County, Kansas. His objective was to sell the land to one Jay Hoffman, whom Dacus knew to be a potential buyer. Appellee Hoffman had farmed the land in controversy since the 1930's, originally as a tenant of Viola's parents, the Vanimans. The tenancy was an oral arrangement, and with respect to this agreement, Hoffman reported to the Vanimans through Paul Sargent and Earl Reed, who were related to the Vanimans and who lived in Kansas. In the early 1950's, Reed informed Hoffman that Viola had inherited the land, and thereafter Hoffman secured a rental arrangement with Viola so that he could continue farming the land. Appellee Hoffman never met Viola or even talked to her on the telephone, and he conducted his business with Viola by letters several times a year. In his letters reporting on the planting and sale of crops, Hoffman several times over the years expressed an interest in purchasing the land because he had already acquired land on three sides of Viola's property.

Armed with the deed and the knowledge that Hoffman wished to buy the land, Dacus and Taylor departed for Kansas. Upon arriving in Kansas, they first contacted a real estate broker and obtained an appraisal of the land at $67,000. Next they drove to the Hoffmans' home and Dacus informed appellees that he was now the owner of the land and that he wished to sell it. Dacus was well dressed and knowledgable about Viola's affairs; he explained that Viola had given him the land as a gift as he had been a loyal employee for seven years. He said she had also suggested that Dacus contact Hoffman who might want to buy the land. After some discussion concerning the price, Hoffman agreed to buy the land for $67,000 with a three year installment arrangement suggested by Dacus for income tax purposes.

The sale was agreed upon, pending the preparation of an abstract of the title, and Dacus and Taylor returned to California. Subsequently, Dacus had advised Hoffman that he had changed his mind about the installment arrangement and he now wanted cash because he wished to invest in a California business. Hoffman agreed and a sales agreement was drawn up on April 11, 1966, with part of the money in escrow and the balance to be paid upon acceptance of title.

Hoffman was admittedly curious about Viola's gift of land to Dacus and he wrote to Viola in the second week of April inquiring about the change of ownership and the proper division of crop payments. The letter was intercepted by a member of Dacus' family who by this time had the complete run of Viola's house. To formulate a reply letter which would satisfy Hoffman's suspicions, a member of Dacus' family prepared a sheet of paper with penciled writing relating to income taxes and presented this to Viola with the explanation that her signature was necessary. After she signed the paper, the writing was erased and a letter was typed above the signature which in substance assured Hoffman that Viola had given the land to Dacus. Upon receiving the letter, Hoffman compared the signature to that on previous letters from Viola and was satisfied that Dacus was the legitimate owner of the land.

Subsequently, on June 1, 1966, Hoffman paid the full purchase price into escrow and the same was distributed to Dacus less $5,000 which was held in escrow pending resolution of an outstanding mineral interest. Soon thereafter, in June of 1966, appellant Nevin learned of Dacus' activities. Civil and criminal actions were filed in California against Dacus and the other conspirators, and Dacus is presently in prison serving a sentence for grand theft as a consequence of his conversion of Viola Nevin's property.

■ From these facts, we have on appeal the action brought by appellant Nevin, guardian of Viola Nevin, seeking to cancel the deed under which appellees hold title, or in the alternative seeking damages. The issue we are confronted with is whether the deed is void for all purposes as appellant contends, or whether it is merely voidable and thereby subject to the claims of a bona fide purchaser as the trial judge held. If the deed is merely voidable we must also determine whether the trial judge correctly decided that appellees were bona fide purchasers and therefore not subject to the infirmities in the chain of title. At the outset we note that in diversity cases, ordinarily we defer to the trial judge's view of unclear state law unless his view is clearly erroneous.[1]

■ The critical finding of fact made by the trial judge is that Viola Nevin did not possess sufficient mind to understand, in a reasonable manner, the nature and effect of the acts in which she was engaged. In other words, she was mentally incompetent when she signed the deed and acknowledged her signature on the deed. The trial judge went on to find that while fraud, undue influence, and trick were a part of Dacus' scheme, they had no real effect upon one without the will to resist, and the determining factor in the conveyance to Dacus was the mental incapacity of Viola Nevin. Upon making this determination the trial judge went on to test the validity of the deed considering only the fact that Viola was mentally incompetent when she signed the deed and disregarding the fraud and undue influence practiced on her to obtain her signature.[2] Since we cannot say that the trial judge was clearly erroneous either as to fact or law in taking this approach we like-

1. Brunswick Corporation v. J & P, Inc., 424 F.2d 100 (10th Cir. 1970); Fulton v. Coppco, Inc., 407 F.2d 611 (10th Cir. 1969); Continental Cas. Co. v. Fireman's Fund Ins. Co., 403 F.2d 291 (10th Cir. 1968).

2. In similar circumstances, the Supreme Court of Kansas has taken a similar approach: "Whatever [undue] influence there was consisted in getting signatures affixed without James [the grantor] knowing what he was doing. Whatever fraud there was consisted in tricking James into doing something about which he had no comprehension. Therefore, the gravamen of this feature of the action [to set aside the deed] was total lack of mental capacity necessary to a valid act." Anderson v. Anderson, 137 Kan. 833, 22 P.2d 471, 474 (1933).

*But see* Bethany Hospital Co. v. Philippi, 82 Kan. 64, 107 P. 530 (1910). *See also* Mann v. Staatz, 156 Kan. 275, 133 P.2d 103 (1943).

wise take the same approach to determining what legal effect should be accorded the deed.

The question whether under Kansas law a deed is void or merely voidable because of the grantor's mental incapacity at the time of execution is a question not easily answered. The Kansas cases appear to be in conflict and none of them are grounded on facts which conform squarely to the facts confronting us here. In the early case of Gribben v. Maxwell, 34 Kan. 8, 7 P. 584, 585 (1885) the court said, "As a general rule, the contract of a lunatic is void *per se*." But the court in Gribben also reasoned that it would be unjust to cause an innocent purchaser to lose both the property and the price he paid for the property. From this, the court decided that if a conveyance is obtained in perfect good faith from an insane person prior to an adjudication of "lunacy," without knowledge of the grantor's condition, for a sufficient consideration and no advantage is taken by the purchaser, the consideration received by the "lunatic" must be returned before the conveyance can be set aside.

In the absence of the combined equities stated in Gribben, the rule that contracts of incompetents are absolutely void appears to be dispositive of an action to cancel an incompetent's deed. The Kansas Supreme Court has said in this regard, "When a man who knows another to be insane sets about getting a deed from the insane person * * * the court takes the land away from the clever person and restores it to the insane person's estate. Rescission as in cases of fraud is not required, * * *"[3] It has often been held that a conveyance obtained from an incompetent person with knowledge of the incompetency and for no consideration, is absolutely void.[4]

It is well established as a general rule that if a deed is absolutely void, a subsequent bona fide purchaser obtains nothing despite his innocence.[5] From this rule, and in combination with the cases saying a conveyance is void if obtained from an incompetent for no consideration and with knowledge of the incompetency, appellant urges that Viola Nevin's conveyance was void as against appellees Hoffmans, even if the Hoffmans were bona fide purchasers. On this basis appellant contends that the trial judge erred in finding the deed merely voidable such that the Hoffmans as bona fide purchasers have a valid claim. Appellant's assertion, however, has not been borne out by the cases.

First we note that the cases establishing that conveyances of incompetent persons are absolutely void have all involved actions against a first grantee who had obtained the conveyance in bad faith and for no consideration. On the face of it, it would seem that if such a deed is absolutely void, it would make no difference whether the action to set aside the deed is against the villianous first grantee or whether the action is against a subsequent bona fide purchaser from the first grantee. However, the contrary appears to be established in Manhattan State Bank v. McLaren, 112 Kan. 538, 211 P. 633 (1923) to the effect that though a deed has been procured from an incompetent by one who gave no consideration and who had knowledge of the incompetency, a subsequent good faith claimant under the deed is protected nevertheless and the deed is not absolutely void as to that latter person.

In McLaren, a brother fraudulently induced his sister—who was mentally incapable to transact business but had not been so adjudged—into conveying to him her life estate in land in which he held

3. Anderson v. Anderson, 137 Kan. 833, 22 P.2d 471, 474 (1933).

4. Cornell University v. Howard, 170 Kan. 633, 228 P.2d 680 (1951); Mann v. Staatz, 156 Kan. 275, 133 P.2d 103 (1943); Bethany Hospital Co. v. Philippi, 82 Kan. 64, 107 P. 530 (1910);

Waller v. Julius, 68 Kan. 314, 74 P. 157 (1904); *see* McElroy v. Security National Bank of Kansas City, Kansas, 215 F.Supp. 775 (D.C.Kan.1963).

5. Stone v. French, 37 Kan. 145, 14 P. 530 (1887).

the remainder. After the conveyance, the brother mortgaged the land to a bank to secure his promissory note. The bank had no knowledge of the sister's incompetency or of the means employed to obtain the conveyance from her. Subsequently, the bank brought suit to recover on the note and foreclose the mortgage, and the question arose whether the sister's conveyance was void so as to defeat the bank's claim on the land. The court held that the bank obtained a valid lien and stated, "The deed in question may have been void as to George [the brother] and only voidable as to the bank." [6] The court relied on the facts that the bank gave valuable consideration for the mortgage, acted in good faith, and was without notice of the incapacity of the sister and the activities of her brother. From this the court concluded that the bank was not subject to the defects in the conveyance from the sister to the brother.

■ Appellant attempts to explain away the language and reasoning employed in McLaren on the grounds that the actual holding was on a lesser and different point. However, the court's own syllabus refutes this and makes clear the holding that the bank obtained a valid lien. Necessarily, this holding is posited on the grounds that, as against the bank, the deed was not void but was merely voidable, and the bank as a good faith mortgagee for value had a valid claim which was good and which prevails despite the infirmity in the chain of title. Analogously, we must conclude from the reasoning of McLaren, Viola Nevin's deed as against the Hoffmans was merely voidable and the Hoffmans should prevail if they are bona fide purchasers.

Appellant further argues that the McLaren case is bad law and should not be followed in this diversity suit. However, the decision in McLaren was specifically approved although in a different factual setting in First National Bank of Beloit v. Kallash, 135 Kan. 73, 9 P.2d 670 (1932). Moreover, the Kansas Supreme Court's opinion in Handley v. Handley, 172 Kan. 659, 243 P.2d 204 (1952) likewise suggests that a conveyance by an incompetent grantor to a grantee who knows of the grantor's condition is not absolutely void but is merely voidable.[7] Since there is Kansas authority supporting the trial judge's view that Viola Nevin's conveyance was merely voidable, we cannot say that the trial judge was clearly in error and we accept his view of the local law in this respect.

This brings us to the question whether appellees were bona fide purchasers and thereby obtained a good title as against the voidable deed. There is no question but that the Hoffmans were purchasers for value; however appellant attacks appellees' good faith. Appellant contends that appellee Jay Hoffman was put on inquiry to further investigate the validity of Dacus' deed, and his failure to make a reasonable investigation is equivalent to want of good faith. Taking it as true that Hoffman was put upon inquiry by the total circumstances of the situation including the knowledge that Dacus obtained his deed for no consideration, we cannot agree with appellant that Hoffman did not make a reasonable investigation. The undisputed facts are that while negotiating with Dacus, Hoffman sent a letter to Viola Nevin inquiring about the change of ownership and the proper division of crop payments in view of her conveyance of the land to Dacus. In reply to this letter, Hoffman received a return letter over the genuine signature of Viola Nevin which in terms verified the fact that she had deeded her land to Dacus. This inquiry made by Hoffman, coupled with the response he received and taken in the light of the total circumstances of this case, leaves no doubt that appellees acted reasonably and in good faith and qualify as bona fide purchasers.

In conclusion we deem it important to observe that appellant contended in the

6. Manhattan State Bank v. McLaren, 112 Kan. 538, 211 P. 633, 634 (1923).

7. See also Ash v. Wulf, 127 Kan. 301, 273 P. 432 (1929).

trial court and continues to contend on appeal that the deed is void for the additional reason that when Viola Nevin's genuine signature was procured by artifice or deceit without intent on her part to execute such a conveyance, this constituted a "civil forgery."[8] The trial court was not persuaded that Kansas courts would adopt and apply the rule of "civil forgery" as have other courts in other jurisdictions. We likewise have found no Kansas case indicating that Kansas has or would adopt this theory. On the contrary, it appears that what is known as civil forgery in some jurisdictions is known as fraud in the execution in Kansas.[9] However, the trial court has found without dispute that Dacus' fraudulent activities were not the determining factor in obtaining the conveyance from Viola Nevin, but that Viola deeded her land over to Dacus as a result of her lack of mental capacity to understand the significance of her acts. In view of the trial judge's undisputed determination that the fraud practiced on Viola had no real effect, we are precluded from considering whether fraud in the execution absolutely voided the deed.

The judgment of the trial court is affirmed.

8. See Horvath v. National Mortgage Co., 238 Mich. 354, 213 N.W. 202 (1927); Anno. 11 A.L.R.3d 1074.

9. *E. g.* Nathoo v. Jones, 111 Kan. 406, 207 P. 645 (1922).